UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
JASON TORRES,

                 Petitioner,    :     REPORT & RECOMMENDATION

                        :

        -against-       :     10 Civ. 8108 (JMF)(MHD)

                        :

MARK L. BRADT, Superintendent,
Elmira Correctional Facility,    :

               Respondent.    :
-----------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/10/12

TO THE HONORABLE JESSE M. FURMAN, U.S.D.J.:

Petitioner Jason Torres seeks a writ of habeas corpus to challenge his November 20, 2006 conviction in New York State Supreme Court, New York County, on single counts of Criminal Possession of a Controlled Substance in the Second Degree, Robbery in the First Degree, Robbery in the Second Degree, and Burglary in the First Degree. Torres is currently serving a twelve-year prison term.

In support of his petition, Torres raises one ground for relief. He contends that the trial court erred in failing to sanction the prosecution for its delayed production of a statement by an eyewitness, Mr. Maurice Brown, thus supposedly preventing Torres from calling Brown at trial. (Pet. ¶ 12). Petitioner claims that this violated the principles of <u>Brady v. Maryland</u>, 373 U.S. 83

1

(1963), and its progeny. (Pet. ¶ 12). He also argues that the trial judge should have admitted Mr. Brown's statement to the police into evidence as a <u>Brady</u> sanction. (<u>Id.</u>).

In opposition, respondent argues that the Appellate Division correctly ruled that there was no <u>Brady</u> violation. (<u>See</u> Resp't's Mem. of Law in Opp'n to Pet. ("Rep't's Opp'n Mem.") at 17-26). According to respondent, Mr. Brown's statement was consistent with the prosecution's case and was not favorable to the petitioner. He further asserts that the petitioner cannot show any reasonable prospect that earlier disclosure of the statement would have enabled the defense to call Mr. Brown to testify. (<u>Id.</u> at 21-23). Finally, respondent argues that, in any event, the petitioner did not have a right to introduce the statement because it lacked reliability. (<u>Id.</u> at 24).

For the reasons that follow, we recommend that the writ be denied and the petition dismissed with prejudice.

<u>PRIOR PROCEEDINGS</u>

The conviction of Torres stemmed from an attempt by four men on February 9, 2006 to invade the apartment of a drug dealer named

2

Leonardo Rojas in order to rob him of his inventory and cash. The men were arrested while still in Rojas's building, and one of the four pled guilty to lesser charges and testified against Torres.

I. The Charges and Trial

A New York County grand jury returned a four-count indictment naming Torres and three cohorts -- Luis Vives, Shane Velasquez and Vincent Sanchez. The charges included criminal possession of a controlled substance in the second degree, robbery in the first degree, robbery in the second degree, and burglary in the first degree. (Tr.[1] 1369-1370). Before trial, Sanchez pled guilty to lesser charges and agreed to cooperate with the authorities. Petitioner and his co-defendants Vives and Velasquez went to trial commencing on October 31, 2006 before the Hon. Maxwell Wiley and a jury. (Tr. 1-2).

At trial, the State proffered evidence concerning the events that took place in Rojas's building on February 9, 2006, and what

_____

[1] All citations to the transcript ("Tr.") without a specified date refer to the transcript of the trial itself, as opposed to pre-trial proceedings. Citations to pre-trial proceedings are indicated by "Tr. [date]", and the post-trial sentencing transcript is cited as "S. Tr.".

3

had led to that incident. Much of that evidence consisted of the testimony of Sanchez and Rojas and a neighbor of Rojas named Bertram Chavous.

At the time of the crime, Sanchez and Velasquez had known each other for a few months and were working together driving a livery cab. (Tr. 179-82). On the night of February 8, 2006, Sanchez and Velasquez drove around for several hours with Vives, who had been a customer of theirs for the prior few days. (Tr. 187-91). Vives made numerous stops that night, and at some point a man named Shorty joined Vives in the cab. (Tr. 192). According to Sanchez, Vives and Shorty talked about a failed drug transaction, and Shorty then mentioned the location of his drug supplier -- Leonardo Rojas -- as 555 West 174th Street. Shorty went on to say that Rojas kept two to three kilos of cocaine in his apartment. (Tr. 191-97, 278, 465-66). Sanchez testified that by the end of the night Vives owed him $200.00 in cab fare and that Vives had not paid him. (Tr. 198, 425).

On the following day, Velasquez picked up Sanchez. Vives was already in the car, as was petitioner Jason Torres. (Tr. 198-99). According to Sanchez, Vives wore a red hooded sweatshirt and a "black puffy jacket", while Torres had on a hooded jacket. (Tr.

4

210, 214, 234-35, 322, 453). Sanchez testified that the other three
men announced their plan to go into Rojas's apartment and steal his
narcotics and money (Tr. 199, 205, 277-78, 372, 374), which Vives
indicated he would use to pay Sanchez the money that he owed him.
(Tr. 201, 379-81). To that end, Sanchez and Velasquez dropped off
Torres and Vives at 555 West 174th Street and returned to that
location about an hour later, apparently expecting to be paid with
some of the loot. (Tr. 203-02).

At about the time that Vives and Torres alighted from the cab,
Mr. Chavous, a resident of 555 West 174th Street, saw two men
standing outside of his building, one of whom was wearing a black
"bubble" jacket. (Tr. 890-893). The men told Chavous that they were
looking for a drug dealer named "Flaco". (Tr. 892-96, 908-09, 925-
26, 992). Chavous told them that there were no drug dealers in the
building and then returned to his apartment. (Tr. 892-93). When
Chavous later left his apartment, the same two men were inside the
building, in the hallway on the first floor. (Tr. 893-94).
According to Chavous, the two took him to Rojas's apartment, told
him that the drug dealer whom they were looking for lived there,
and asked Chavous to knock on the door to see if Rojas was there.
(Tr. 894-95, 909). Chavous testified that at this point, the two
men were telephoning for two others -- presumably Sanchez and

5

Velasquez -- and that they already knew that Rojas was in his apartment. (Tr. 895-96). Chavous declined to assist these men and left the building, but when he returned a short time later, all four men were inside the building, apparently searching for a woman to knock on Rojas's apartment door. (Tr. 897-99).

According to Sanchez, when he and Velasquez arrived at 555 West 174th Street, they went up to the second floor to meet Torres and Vives, and the others reiterated their plan for the robbery, which Sanchez then decided to join. (Tr. 202-05, 282, 284-85, 382-84). At that point, apparently by coincidence Ms. Della Garrett, Chavous's wife, was knocking on the door of Rojas's apartment. She was doing so because he had given her a dollar to make a phone call on an outside line, and she was returning the change. (Tr. 285-86, 566-68, 666-67). Rojas opened the door, at which point Vives and Velasquez knocked Ms. Garrett down and forced themselves into the apartment, one of them holding a knife, followed shortly after by Torres and Sanchez. (Tr. 204, 568-69, 667-68). Sanchez testified that, once inside the apartment, he looked in the kitchen and bedroom for items to steal. At the same time, Vives and Velasquez were standing beside Rojas, who was lying on a bed, and Torres was taking the television cables to tie up Rojas's arms. (Tr. 207-09, 676-80). The men took money, drugs, and other valuables, and after

6

about eight minutes they left the apartment, at which point they encountered the police outside the apartment. (Tr. 207-11, 695-97).

When the police first arrived, they were responding to a 911 call from a man who had reported that, while ascending the staircase at the building, he had seen "two Spanish young boys" pushing their way into apartment 2B and that he had heard the victim screaming. (Tr. 136-39, 144, 1132-33). The officers saw one man on the landing, and when he saw the officers he started to walk towards apartment 2B. (Tr. 501-02). As the police approached the apartment, they saw the other three men in the hallway outside the apartment. (Tr. 501-02). Once the men saw the police, they all froze except for Vives, who tried to flee. (Tr. 211). Police Officer Michael Gross grabbed Vives, and while they struggled Rojas fired a shot from within his apartment. (Tr. 502, 504, 699-700). The other three men were on the ground, and Officer Carl Bennett fired two return shots towards the apartment. (Tr. 212, 503-05, 509).

After the shooting ended, other officers arrived at the location. (Tr. 505, 535-37). The officers handcuffed Torres, Vives, Velasquez, and Sanchez, and recovered a jacket belonging to Vives with narcotics inside one pocket and $1,350.00 inside another

7

pocket, as well as a kitchen knife, sunglasses, a gold ring, a gold bracelet, and other items. (Tr. 505-07, 630, 770-71, 1045, 1047, 1052-53, 1063, 1065). Sergeant Joseph Farrell then knocked on the door of apartment 2B, and Rojas opened the door. (Tr. 771). Rojas spoke with the officers and was later arrested. (Tr. 709-10).

At central booking on February 10, 2006, Vives encountered Rojas and threatened to kill him if he testified against Vives. (Tr. 717-18). A few months later, Rojas told Vives that he was going to testify against him, which led to a fight. (Tr. 718).

The defendants did not call any witnesses. On November 20, 2006, the jury convicted Torres and Vives on all counts -- criminal possession of a controlled substance in the second degree, robbery in the first degree, robbery in the second degree, and burglary in the first degree -- and found Velasquez not guilty on one count -- criminal possession of a controlled substance in the second degree. (Tr. 1368-75). Torres filed a motion to set aside the verdict pursuant to N.Y. C.P.L.R. § 330.30, which was denied (S. Tr. 14), and on December 21, 2006 Justice Wiley sentenced Torres, as a predicate felon, to concurrent twelve-year terms of imprisonment on each count, followed by five years post-release supervision. (S.

Tr. 22).[2]

## II. The Direct Appeal

Petitioner sought to challenge his conviction and sentence on appeal to the First Department. (Pet. ¶ 9).[3] In support of his appeal, Torres asserted five grounds. First, he complained that the trial court had improperly rejected defense challenges for cause to four prospective jurors, who, according to Torres, would not state that they would render an impartial verdict. (Pet. ¶ 9; Fleischmann Decl. Ex. A (Def.-Appellant's Br.) at 24-44). Second, he claimed that he had been denied due process because his conviction was based on the accounts of incredible witnesses, whose testimony had differed on whether Torres had been involved in the crime. (Def.-Appellant's Br. at 45-54). His third ground, reiterated on this petition, is that the trial court erred by failing to sanction the prosecution for delayed disclosure of Brady material -- specifically, a statement made to the police by the 911 caller, who

_____

[2] Vives, convicted on the same counts as Torres, was sentenced to concurrent terms of 17 years for drug possession, first-degree robbery and first degree burglary and 15 years for second-degree robbery. Velasquez was convicted after a second trial of first- and second-degree robbery and burglary and sentenced to concurrent nine-year prison terms. (Fleischmann Decl. Ex. B at 1-3 & n.1).

[3] Vives pursued a joint appeal with Torres.

was a next-door neighbor of Rojas named Maurice Brown. (Pet. ¶ 9; Def.-Appellant's Br. at 55-68). Torres contended that if the statement had been disclosed early enough, he would have been able to locate Brown, who would have testified favorably for him at trial. Under these circumstances, Torres contended, the trial judge should have admitted into evidence Brown's statement to the police about what he had seen and heard during the incident. (Id. at 55, 67-68). Torres's fourth ground involved a complaint that the trial judge had conducted a hearing on the admission of evidence outside the presence of petitioner. (Pet. ¶ 9; Def.-Appellant's Br. at 69-76). Finally, Torres claimed that his sentence was excessive. (Pet. ¶ 9; Def.-Appellant's Br. at 77-85).

On April 14, 2009, the First Department affirmed petitioner's conviction and sentence. People v. Torres, 61 A.D.3d 489, 491, 878 N.Y.S.2d 673, 674 (1st Dep't 2009). The court rejected the jury-selection argument because Torres had not exhausted all of his peremptory challenges. Id. at 490, 878 N.Y.S.2d at 674. As for Torres's argument that he was absent from one evidentiary colloquy, the court held that his absence was "de minimus" and that it would be speculative to say that his presence would have altered the outcome of the court's ruling. Id. (citing People v. Roman, 88 N.Y.2d 18, 26-27, 643 N.Y.S.2d 10 (1996)).

10

Regarding the asserted _Brady_ violation, the court found that "the witness's statement tended to corroborate the prosecution's case rather than providing exculpatory evidence. Furthermore, there is no reason to believe that earlier disclosure of the information would have resulted in the witness being available to testify." _Id._ at 490, 878 N.Y.S.2d at 675 (citing _People v. Buie_, 289 A.D.2d 140, 735 N.Y.S.2d 45 (2001)). The appellate panel then held that the trial court had properly exercised its discretion by not admitting the witness's hearsay statement. _Id._ at 491, 878 N.Y.S.2d at 675.

The First Department also rejected Torres's argument that the evidence against him was insufficient and that the verdict was against the weight of the evidence. _Id._ Finally, the court stated that it "perceive[s] no basis for reducing [Torres]'s sentence." _Id._

Torres sought leave to appeal to the New York Court of Appeals on the _Brady_ issue, including the trial court's refusal to sanction the prosecution by admitting Brown's statement to the police. (Pet. ¶ 11; Fleischmann Decl. Ex. D (Pet'r's Leave Appl.)). The prosecution opposed that application (_see_ Fleischmann Decl. Ex. E (Leave Opp'n)), and on June 5, 2009, the Court of Appeals denied leave. (Pet. ¶ 11; Fleischmann Decl. Ex. F (Certificate Den.

11

Leave)).

Following the issuance of that order, Torres moved for reargument on the <u>Brady</u> issue. (Pet. ¶ 11; Fleischmann Decl. Ex. G (<u>Pro</u> <u>Se</u> Br.)). On August 18, 2009, the Court of Appeals denied the motion. (Pet. ¶ 11; Fleischmann Decl. Ex. H).

<u>ANALYSIS</u>

I. <u>The Current Petition</u>

In Torres's habeas petition, he asserts one claim, that the trial court erred in failing to sanction the prosecution for delaying the disclosure of <u>Brady</u>/<u>Rosario</u> material. The source of his complaint is that the prosecutor did not turn over to the defense a statement made by Brown to the police until the day before trial began and then could not locate the witness to testify at trial. (Pet. ¶ 12). He asserts that the statement was potentially exculpatory and -- we glean from his previous filings -- that the delay in its production precluded his own ability to locate Brown and call him as a defense witness. He further argues that, as a result of this asserted prosecutorial misconduct, the trial court should have admitted the witness's statement into

12

evidence notwithstanding its hearsay status. (<u>Id.</u>).

Respondent argues that Brown's statement was not favorable to petitioner, but rather corroborated the prosecution's case. He further asserts that earlier disclosure of the witness's identity would not have enabled the defense to locate Brown to obtain his testimony. (Resp't's Opp'n Mem. at 17, 22-23). Finally, respondent urges that Torres had no constitutional right to introduce the witness statement, and that the statement would not have affected the outcome of the trial. (<u>Id.</u> at 24-25).

## II. <u>Standard of Review</u>

The stringency of federal habeas review turns on whether the state courts have passed on the merits of the petitioner's claim, that is, whether the decision of the highest state court to consider the claim is "based on the substance of the claim advanced, rather than on a procedural, or other, ground." <u>Sellan v. Kuhlman</u>, 261 F.3d 303, 311 (2d Cir. 2001) (discussing 28 U.S.C. § 2254(d)). "[T]he state court need only dispose of the petitioner's federal claim on substantive [not procedural] grounds, and reduce that disposition to judgment. No further articulation of its rationale or elucidation of its reasoning process is required."

13

Aparicio v. Artuz, 269 F.3d 78, 93-94 (2d Cir. 2001) (citing Sellan, 261 F.3d at 312). If the state court has addressed the merits, the petitioner may obtain relief only if the state court's ruling

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). See, e.g., Bell v. Cone, 535 U.S. 685, 693-94 (2002); Williams v. Taylor, 529 U.S. 362, 412-13 (2000); Besser v. Walsh, 601 F.3d 163, 178 (2d Cir. 2010), vacated on other grounds sub nom., Portalatin v. Graham, 624 F.3d 69 (2d Cir. 2010) (en banc); Howard v. Walker, 406 F.3d 114, 121-22 (2d Cir. 2005); Brown v. Artuz, 283 F.3d 492, 497-98 (2d Cir. 2002).

Clearly established federal law "'refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision.'" Howard, 406 F.3d at 122 (quoting Kennaugh v. Miller, 289 F.3d 36, 42 (2d Cir. 2002)). "[A] decision is 'contrary to' clearly established federal law 'if the state court arrives at a conclusion opposite to that reached by

14

[the Supreme] Court on a question of law or if the state court decided a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.'" Id. (quoting Williams, 529 U.S. at 413).

What constitutes an "unreasonable application" of settled law is a somewhat murkier proposition. "'A federal court may not grant habeas simply because, in its independent judgment, the "relevant state-court decision applied clearly established federal law erroneously or incorrectly."'" Id. (quoting Fuller v. Gorczyk, 273 F.3d 212, 219 (2d Cir. 2001) (quoting Williams, 529 U.S. at 411)). The Supreme Court observed in Williams that "unreasonable" did not mean "incorrect" or "erroneous," noting that the writ could issue under the "unreasonable application" provision only "if the state court identifies the correct governing legal principle from this Court's decisions [and] unreasonably applies that principle to the facts of the prisoner's case." 529 U.S. at 410-13. As implied by this language, "'[s]ome increment of incorrectness beyond error is required . . . [H]owever, . . . the increment need not be great; otherwise habeas relief would be limited to state court decisions "so far off the mark as to suggest judicial incompetence."'" Monroe v. Kuhlman, 433 F.3d 236, 246 (2d Cir. 2006) (quoting Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000)); accord Richard S. v.

15

Carpinello, 589 F.3d 75, 80 (2d Cir. 2009).

Under the Supreme Court's most recent, and arguably more stringent, interpretation of the statutory language, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 131 S. Ct. 770, 786 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). "Under § 2254(d), a habeas court must determine what arguments or theories supported or . . . could have supported[] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id. Under this more recent interpretation, a federal habeas court has "authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." Id. In other words, to demonstrate an 'unreasonable' application of Supreme Court law, the habeas petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."

16

<u>Id.</u> at 786-87.

As for the state courts' factual findings, under the habeas statute "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); <u>Richard S.</u>, 589 F.3d at 80-81; <u>McKinney v. Artuz</u>, 326 F.3d 87, 101 (2d Cir. 2003); <u>see generally</u> <u>Rice v. Collins</u>, 546 U.S. 333, 338-39 (2006).

III. <u>The Brady Claim</u>

To assess petitioner's claim, we start with a brief summary of the pertinent events regarding the genesis of the statement by Brown to the police. As noted, Brown first contacted law enforcement by a 911 telephone call during which he reported having observed two men, whom he described as "Spanish young boys" pushing into the next-door apartment of Mr. Rojas. He described one of the men as wearing a red-hooded sweatshirt and a black winter coat and the other as wearing a blue winter coat with a white or blue hood and blue or "dark, dark" sweatshirt. (Fleischmann Decl. Ex. B (Resp't's Appellate Br.) at 60).

On the day of the attempted robbery, the police interviewed Mr. Brown, and he provided a statement that was substantially similar to his 911 report. That statement was summarized by the police in a so-called DD-5 form, which stated:

> [J]ust before the incident, he did exit his apartment to go down stairs to the store. He did see two M/H [male Hispanics], one wearing a red hooded sweatshirt and the other wearing a black sweatshirt standing on the steps. Said individuals did follow Mr Brown down stairs into the lobby and watched him exit the building. Mr Brown advised he returned from the store and was followed by said individuals back upstairs to the second floor. Mr Brown entered and locked his apt door. Shortly after he did hear the sound of a scuffle outside his door with sound of male voices yelling ["]get out the way and get in["]. He then heard the door slam. Mr Brown stated he did hear male voices yelling with a female and male voice responding coming from inside apt 2B. He heard the intercom buzzer from inside said apt and it became quite [sic.]. Mr Brown stated he heard the apartment door open and the sound of the police yelling, ["]police don't move["] and the sound of a struggle. He advised he then heard the sound of two gun shots followed by more yelling. Mr Brown did look outside his apt and [] observed the same two individuals he saw earlier in custody and removed by responding police officers. Mr. Brown further stated he did not see perp's faces and could only identify them by the clothes they were wearing.

(Id. at 61-62).

On or about March 22, 2006 the prosecutor filed a Voluntary Disclosure Form advising defense counsel that the State intended to use certain recordings at trial, including the tape of the 911 call

18

by Mr. Brown, and offering to provide copies of the tapes to counsel. (<u>Id.</u> at 60). In August 2006 the State provided those copies to the defense attorneys. (<u>Id.</u>)

At pretrial conferences on October 26 and 27, 2006, counsel addressed a motion by the State to introduce the 911 tape into evidence. Counsel for co-defendant Vives reported that he had listened to the tape about a month and a half earlier. At the same time counsel for co-defendant Velasquez and the court mentioned that the State may have difficulty in locating Brown and obtaining his testimony. Counsel for Torres as well the attorney for Velasquez then opposed introduction of the 911 tape unless the State obtained Brown's testimony. (<u>Id.</u> at 60-61).

On October 30, 2006, during jury selection, the prosecutor turned over <u>Rosario</u> material to defense counsel. That material included the DD-5 recounting Mr. Brown's statement to the police after the arrest of petitioner and his colleagues. (<u>Id.</u> at 61).

The State began to present its case on November 2, 2006, including as a witness that day a Police Department media technician who testified to authenticate the 911 tape of Mr. Brown's call. (Tr. 136-48). It continued to present its case for

19

twelve more days, without any suggestion by any defense counsel that the DD-5 was <u>Brady</u> material or any objection as to the timing of its production. (Resp't's Appellate Br. at 62).

On November 14, 2006 counsel for defendant Velasquez stated that he believed that a portion of Brown's statement was <u>Brady</u> material for his client, and he objected to the State's asserted decision not to call Brown as a witness. He conceded that he had received the DD-5 before the start of the trial but complained that its production was too late to permit him to find Brown, and he asked that the State stipulate to the introduction of the DD-5 into evidence. (Tr. 1004-05, 1091-92). When asked what was exculpatory in the statement, Velasquez's attorney stated that, based on the post-arrest photos of the defendants, his client could not have been either of the two men described by Brown. He also contended that Brown had been unclear as to whether any of the men had forced their way into the apartment and that his reference to having heard a buzzer was somehow consistent with Velasquez's innocent explanation for his presence in the building. (Tr. 1093-95).

At that point counsel for Torres chimed in, contending that Brown's description of the two men whom he saw would not match Torres either. He then joined in the application of Velasquez. (Tr.

20

1095).[4]

In response, the prosecutor confirmed that the State had been unable to locate Brown, precluding his being called as a witness. He also noted, however, that since before the start of the trial the State had reported that it might be unable to locate this witness. He observed as well that the admission of the 911 tape had been predicated on the possibility that Brown could not be called as a witness. Finally, he declined to stipulate to the admission of the DD-5. (Tr. 1005, 1095-96).

The trial judge concluded that no Brady violation had been shown. He observed that much of what Brown reported concerned only sounds that he had heard while he was in his apartment. He further found that the statement was at least as consistent with the prosecution's version of events as with the defendants'. He also declined to admit the DD-5 over the State's objection, noting that it bore no indicia of reliability and hence was barred from admission. (Tr. 1096-97).

As noted, on appeal the Appellate Division found that the

---

[4] Vives did not join this application.

statement in the DD-5 tended to corroborate the prosecution's case and hence was not exculpatory. It further concluded that there was no reason to infer that earlier disclosure of the statement to the defense would have made the witness available. Finally, it upheld the discretionary decision of the trial court not to permit the introduction of the statement. Torres, 61 A.D.3d at 490-91, 878 N.Y.S.2d at 675. These rulings are plainly correct and certainly do not unreasonably apply the pertinent Supreme Court precedents.

In Brady v. Maryland, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment[.]" 373 U.S. 83, 87 (1963). To establish a Brady violation, the petitioner must satisfy three tests. First, he must show that the evidence at issue was favorable to him, in that it is either exculpatory or impeaching. See, e.g., Strickler v. Greene, 527 U.S. 263, 281-82 (1999). If the evidence could have been reasonably interpreted as exculpatory, it is deemed favorable to the petitioner. See United States v. Rivas, 377 F.3d 195, 199-200 (2d Cir. 2004) (vacating conviction on Brady grounds based on suppression of statement that could reasonably be viewed as either exculpatory or inculpatory).

22

Second, he must demonstrate that the evidence was suppressed by the prosecution. Id. at 199. Suppression will be found if the prosecutor did not turn over the material or failed to provide it in time to permit its effective use. See, e.g., United States v. Coppa, 267 F.3d 132, 142 (2d Cir. 2001); Watson v. Greene, 2009 WL 5172874, *31 (E.D.N.Y. Dec. 30, 2009), rev'd on other grounds, 640 F.3d 501 (2d Cir. 2011); United States v. Escober, 842 F. Supp. 1519, 1529 (E.D.N.Y. 1994).

Finally, the evidence must be material. See Coppa, 267 F.3d at 141-42; Kyles v. Whitley, 514 U.S. 419, 432-33 (1995). Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985). The reasonable-probability standard does not require "demonstration by a preponderance [of the evidence] that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal[,]" nor must the defendant "demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." Kyles, 514 U.S. at 434-35. Rather, the question is whether the accused "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id. at 434. In

23

making that determination, the court must analyze the potential impact of the suppressed evidence "collectively, not item-by-item." Id. at 436. Finally, if the court decides that the suppressed evidence was material, the defendant is deemed to have been prejudiced, obviating the need for harmless-error review. Id.

The Appellate Division reasonably, and indeed correctly, held that Mr. Brown's statement to the police was not favorable to Torres, and rather tended to reinforce the State's case insofar as it relied on the testimony of Sanchez, Rojas, Chavous and the officers who appeared on the scene and arrested the four men whom they found clustered outside Rojas's apartment. Torres, 61 A.D.3d at 490, 878 N.Y.S.2d at 675. Mr. Brown reported first having seen two men -- one wearing a red hooded sweatshirt (concededly Vives) and the other wearing a black sweatshirt -- roaming the hallways of the building, and then, from inside his apartment, hearing a scuffle with male voices yelling and a female and male voice responding, followed by a struggle, the appearance of police officers, and gun shots. Then he opened his door and saw the same two men in police custody, although he could not see their faces.

These facts do not support the defense theory – which was that Torres had entered the building separately from the others and with

24

an innocent purpose and was mistakenly arrested by the police.
Rather, Brown's statement tends to corroborate the prosecution's
case. As the prosecution witnesses testified, Torres and Vives were
present in the building hallways for an extended period, and were
eventually joined by Sanchez and Velasquez. Then Ms. Garret knocked
on Mr. Rojas's door, was knocked over and screamed, and Rojas
screamed as the defendants pushed themselves into the apartment.

Although petitioner argues that he was not one of the two men
described by Mr. Brown -- one wearing a red hooded sweatshirt and
the other wearing black -- it appears that in fact Torres was clad
in a hooded jacket or sweatshirt of a dark color (either black or
blue) -- thus corresponding to Brown's description. (See Resp't's
Appellate Br. at 22, 66-67; Tr. 214, 322, 1067-68; see also Tr.
Aug. 22, 2006 at 112; Def.-Appellant's Br. at 17 n.2). Moreover,
although Torres suggests that he entered the building after the
apartment invasion and was mistakenly arrested by the police who
subsequently arrived, Brown's statement offers absolutely no
support for this contention. Indeed, as noted, Brown identified a
man who appears to have been Torres as being in the building with
Vives before the robbery, just as the prosecution claimed, and in
police custody afterwards, which further corroborates the
prosecution's case. In short, the witness statement does not

25

exculpate Torres in any way.

Furthermore, the fact that in Brown's statement he referred to seeing two men in the hallway and not four does not help petitioner's case. As noted, Chavous testified that initially there were two men walking up and down the staircase prior to the robbery, and Brown's report is consistent with this account. Moreover, although Brown mentioned seeing only two men before the apartment invasion, at the time of the invasion he was in his own apartment and thus he reported only hearing various sounds that corresponded to the accounts of Sanchez and Rojas. As for his post-arrest viewing of the scene, he stated only that he saw the same two men standing in the hallway. This statement does not exculpate the other two men to their part in the robbery, and in any event it further inculpates the two men whom he had seen before. Since all of the trial evidence demonstrates that Torres was one of the two men who first entered the building and were seen by Chavous and then Brown, the witness statement could not reasonably be read to exculpate petitioner.

Apart from not being exculpatory, the statement by Mr. Brown was not material. As noted, the statement did not assist Torres's version of events, and the trial evidence so clearly established

26

his involvement that its introduction would not have affected the level of "confidence" we might have in the jury's verdict. Moreover, there is no reason to believe that earlier disclosure of the witness statement and/or the identity of the witness would have resulted in the availability of the witness to testify for Torres. See Kyles, 514 U.S. at 434-435.

Since Mr. Brown's statement to the police was not favorable to petitioner, it cannot be said that had it "been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682. Additionally, there was "overwhelming evidence of guilt" introduced at trial, showing that Torres participated in the robbery. See Leka v. Portuondo, 257 F.3d 89, 104 (2d Cir. 2001) (citing Spicer v. Roxbury Corr. Inst., 194 F.3d 547, 561 (4th Cir. 1999); United States v. Orena, 145 F.3d 551, 559 (2d Cir. 1998)). The testimony of Sanchez and Rojas coincided in their respective descriptions of the robbery, and both identified Torres as a participant in the crime. (Tr. 205-09, 670, 672-74). Moreover, the police found Torres at the crime scene, in the company of the other three robbers, with the group collectively in the possession of drugs, cash and other items stolen from Rojas. (See, e.g., Tr. 769-71 (describing all defendants handcuffed in the hallway and eyeglass cases, a gold ring, a gold bracelet, a knife,

27

and a black jacket (Vives's) found on the floor), 1043-45
(describing Torres arrested and items on the hallway floor
including a black jacket, a baseball cap and sunglass cases), 1063
(describing jewelry, a black jacket, red cap and sunglasses found
on the second floor hallway)). In short, Brown's statement would
not have benefitted Torres's defense in any respect, much less
posed the prospect of an acquittal.


     Petitioner also cannot show that the prosecutor suppressed the
statement, within the meaning of Brady. It is a "longstanding
constitutional principle that as long as a defendant possesses
Brady evidence in time for its effective use, the government has
not deprived the defendant of due process of law simply because it
did not produce the evidence sooner." Coppa, 267 F.3d at 144. The
prosecutor provided the statement to defense counsel a few days
before the first witness testified, and although Torres complains
that this timing precluded his attorney from locating Brown to call
him as a witness, there is no reason to believe that if the
prosecution disclosed Mr. Brown's police statement earlier, he
would have been available to testify and that the defense would
have made the effort to obtain his appearance.

Approximately two weeks passed from the time that the prosecution turned over Mr. Brown's statement to the defense and the moment when Velasquez's and Torres's counsel argued that the statement was <u>Brady</u> material and that they did not have the time or resources to find Mr. Brown. However, if Torres's counsel had believed that Mr. Brown was going to provide exculpatory testimony, he presumably would have attempted to find him within those two weeks, or at least attempted to have his witness statement admitted at an earlier point. Indeed, it was apparent even before the trial that there may be difficulty in finding Mr. Brown. (Tr. Oct. 26, 2006, at 22; Tr. Oct. 27, 2006, at 51, 57). Further, the defendant's counsel knew about Mr. Brown's 911 call months before trial and at least his co-defendant' counsel had listened to the tape of the call at least a month before trial. (Tr. Aug. 10, 2006, at 96; Tr. Aug. 22, 2006, at 76; Tr. Oct. 26, 2006, at 22-23). There is also no evidence that Mr. Brown would have been available even if the defense sought to contact him before trial. Therefore, Torres fails to demonstrate that earlier disclosure would have resulted in Mr. Brown's availability to testify.

Finally, since the prosecution did not commit a <u>Brady</u> violation, there was no reason for the trial court to sanction the prosecution. Thus, in addressing Torres's proposed sanction -- to

29

admit the witness statement into evidence -- the Appellate Division correctly concluded that the trial court had "properly exercised its discretion in declining to admit the witness's hearsay statement, and Torres has not established that he was constitutionally entitled to introduce it." <u>People v. Torres</u>, 61 A.D.3d at 491, 878 N.Y.S.2d at 675.

In sum, the appellate court's rejection of the petitioner's <u>Brady</u> claim was neither contrary to, nor an unreasonable application of <u>Brady</u> and its progeny.

## CONCLUSION

For the reasons stated, we recommend that the writ be denied and the petition dismissed with prejudice. We further recommend that certificate of appealability not be issued, as petitioner has not presented any issue worthy of appellate review.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on

all adversaries, with extra copies to be delivered to the chambers

of the Honorable Jesse M. Furman, Room 630, and to the chambers of

the undersigned, Room 1670, 500 Pearl Street, New York, New York

10007. Failure to file timely objections may constitute a waiver of

those objections both in the District Court and on later appeal to

the United States Court of Appeals. See 28 U.S.C. § 636(b)(1); Fed.

R. Civ. P. 72, 6(a), 6(d); Thomas v. Arn, 474 U.S. 140, 150-52

(1985); DeLeon v. Strack, 234 F.3d 84, 86 (2d Cir. 2000) (citing

Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir.

1989)).


Dated: New York, New York
       July 6, 2012



                              RESPECTFULLY SUBMITTED,



                              _____
                              MICHAEL H. DOLINGER
                              UNITED STATES MAGISTRATE JUDGE

Copies of the foregoing Report and recommendation have been mailed today to:

Mr. Jason Torres
# 07-A-0494,
Gourverneur Corr. Facility,
P.O. Box 480
Gouverneur, New York 13642-0370

Lisa Ellen Fleischmann, Esq.
Alyson J. Gill, Esq.
New York State Office of the Attorney General
120 Broadway
New York, New York 10271